# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

BRENDA E. BARBEE,                    :

          Plaintiff,          :

                                              Case No. 3:09CV00133

  vs.                                        :

                                              District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                    :       Magistrate Judge Sharon L. Ovington
     Commissioner of the Social
     Security Administration,          :

          Defendant.          :

# REPORT AND RECOMMENDATIONS[1]

## I.    INTRODUCTION

Plaintiff Brenda Barbee sought financial assistance from the Social Security Administration by applying for Disability Insurance Benefits ["DIB"] and Supplemental Security Income ["SSI"] on November 17, 2003, alleging disability since October 20, 2003.  (Tr. 49-51, 255-57).  Those applications were denied initially and on reconsideration.  (Tr. 33-39, 259-62, 265-68).  Following a hearing before Administrative Law Judge ["ALJ"] Melvin A. Padilla on January 19, 2006

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

(Tr. 284-314), ALJ Padilla issued an August 24, 2006 decision denying Plaintiff

benefits based on his conclusion that Plaintiff remained able to perform her past

relevant work.  (Tr. 13-26).

After the Appeals Council denied Plaintiff's request for review (Tr. 4-6),

Plaintiff brought an action in this Court for judicial review of the Commissioner's

final decision.  *See Barbee v. Comm'r of Soc. Sec.*, Case No. 3:07-cv-161 (S.D. Ohio

Nov. 14, 2007).  (Tr. 336-49).  In the Report and Recommendations that he issued

in that case, Magistrate Judge Michael R. Merz noted that the administrative

record "contain[ed] a part of a medical record which belongs to an individual

other than Plaintiff" (Tr. 346),[2] and found that the ALJ had "relied, at least in

part," on that erroneous evidence.  (Tr. 347).[3]  Because "[t]his Court cannot, and

should not, say what conclusion Judge Padilla would come to in the absence of"

such wrongly-included medical information (*id.*), Magistrate Judge Merz

recommended that the matter be remanded.  (Tr. 348).  District Judge Walter H.

Rice thereafter adopted the Magistrate Judge's Report and Recommendations –

including the implicit suggestion that the Commissioner "request an additional

---

[2](*See* Tr. 223) (indicating that "THIS PAGE HAS BEEN REMOVED" from the
administrative record now before this Court "BECAUSE IT BELONGS TO ANOTHER SSA
NUMBER HOLDER").

[3](Referring to Tr. 19) (where even ALJ Padilla himself questioned whether "Dr. Ailes[']
record" there discussed "pertain[s] to this patient" {Barbee]).

examination by a consulting physician as part of the remand proceedings" (Tr. 348) – and remanded the matter for further administrative proceedings. (Tr. 338-39).

The Appeals Council then remanded the case to the ALJ, directing him to re-evaluate the treating source opinion of Dr. Ailes and to obtain "a new consultative examination with a different physician." (Tr. 332-33, 350-51). On remand, ALJ Padilla held a second hearing on August 28, 2008. (Tr. 518-45). On February 4, 2009, he again denied Plaintiff's claim, this time finding that Plaintiff could not return to her past relevant work, but nonetheless remained able to perform other work available in the national economy. (Tr. 315-29). That determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. §§ 405(g), 1383, which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #12), the administrative record, and the record as a whole.

Plaintiff seeks an order reversing the ALJ's decision and granting Plaintiff benefits, or at a minimum, a remand of this case to the Social Security

Administration to correct certain alleged errors.  The Commissioner seeks an Order affirming the ALJ's decision.

## II.   BACKGROUND

Born in 1954, Plaintiff was classified as a "younger" individual on her alleged onset date, but was "closely approaching advanced age" at the time of the ALJ's 2009 decision.  (Tr. 327).  *See* 20 C.F.R. §§ 404.1563; 416.963.[4]  Plaintiff has a high school education, *see* 20 C.F.R. § 416.964(b)(4), and past relevant work as a data entry clerk.  (Tr. 62, 67).

Plaintiff reportedly stopped working on October 20, 2003, because she was "layed [sic] off."  (Tr. 61).  She alleges that she is unable to work due to asthma, an artificial left leg, osteoporosis, and a bulging disc.  (*Id.*).

At the first hearing before the ALJ, Plaintiff testified that she weighed 310 pounds (Tr. 287) and was about five feet, two inches tall.  (Tr. 308).  She last worked full-time in October 2003 as a data entry clerk, but thereafter worked part-time delivering newspapers for four or five months, until May 2005.  (Tr. 288-89, 299-301).  She said that she earned about $200 every two weeks delivering papers.  (Tr. 289).[5]

---

[4]Subsequent citations will identify only one set of the pertinent DIB or SSI Regulations, with full knowledge of the corresponding Regulations.

[5]Plaintiff's 2005 income tax returns reflect $20,885 in income for that year.  (Tr. 361, 368).

Plaintiff testified that she was disabled due to an artificial leg, back problems, and arthritis. (Tr. 289-90). She stated that she sporadically developed ulcers on her stump and could not wear her prosthesis until the infection cleared. (Tr. 289-90, 302-03). Plaintiff estimated that she missed work three or four times between October 2002 to October 2003 due to this problem. (Tr. 303). She also claimed to have constant sharp pain in her lower back. (Tr. 290). Plaintiff reported that she tried physical therapy, but it did not help. (*Id.*). She took prescription medication that "might dull" her back pain "off and on," but "doesn't really help that much," either. (Tr. 291-92). She had been advised to lose weight, but said that her health issues prevented her from exercising. (Tr. 293). She reported using a cane for about three years. (Tr. 304). She also took medications to control her blood pressure and asthma, and for osteoporosis. (Tr. 292). She testified that she saw Dr. Ailes, her primary care physician, every one or two months, but saw no other physician regularly. (Tr. 291-93).

Plaintiff reported that she had a driver's license and drove about two times per week. (Tr. 287-88).[6] She also reported difficulty sleeping. (Doc. 293). Plaintiff testified that she could walk for only a few minutes at a time before needing to stop and sit, and could stand or sit for just minutes at a time before

_____

[6]Plaintiff's 2005 income tax returns indicate that she drove over 12,000 miles for her paper route that year. (Tr. 364).

needing to move. (Tr. 293-94). She testified that she avoided climbing stairs, and that she could lift a gallon of milk but it "bothers" her. (Tr. 294). She stated that she cooked using the microwave "so I don't have to stand," and also sat down to wash dishes. (Tr. 294-95). A niece helped Plaintiff with household tasks, and she reported "hardly go[ing] out at all." (Tr. 295).

Plaintiff then described her consultative examination with Dr. Padamadan in January 2004, reiterating her complaint that he never examined her back. (Tr. 306-08).[7]

At the second hearing in August 2008, Plaintiff's weight had dropped to 286 pounds. (Tr. 521, 531). She testified that her back pain had worsened to the point that "I'm in severe pain 24/7" (*id.*); the pain occurred "all the time" and was "very severe, sharp." (Tr. 522). Intervening physical therapy had not helped. (*Id.*). She had seen a chiropractor for back treatments, and was seeing a new family doctor as needed, who gave her no pain medications. (*Id.*, Tr. 525). The chiropractic treatments helped "a little," she said. (Tr. 529). She also reported "anxiety and depression" due to her situation, and claimed to leave her house only for appointments. (Tr. 523). Sleep difficulties continued, but her high blood pressure, osteoporosis and asthma remained under control with

---

[7]Plaintiff previously complained to the Social Security Administration about the examination that Dr. Padamadan performed. (*See* Tr. 74-75).

medication.  (Tr. 524-25).  She also continued to get occasional ulcers on her

stump.  (Tr. 525, 526-27).  Plaintiff reported no side effects from her medications.

(Tr. 525).  She testified that she could walk, stand or sit for just minutes at a time

before she needed to adjust her position.  (Tr. 526).  She also reported that she

had been using two canes consistently for about eight or nine months.  (Tr. 530).

Plaintiff reported no other changes in her routine or activity level.  (Tr. 526).

Charles Ryan, Ph.D., testified as a vocational expert ["VE"] at the 2006

hearing.  (Tr. 308-14).  The ALJ asked the VE to consider a hypothetical person

with Plaintiff's vocational characteristics who could perform no more than light

exertional work; was permitted to alternate positions as needed; should not climb

ladders or scaffolds or work at unprotected heights; was limited to inside work in

a temperature-controlled and clean air environment; should not balance, crawl or

kneel; and should push and pull only occasionally with the left lower extremity.

(Tr. 309-10).  The VE testified that such a person could perform Plaintiff's past

work as a semi-skilled data entry clerk.  (Tr. 310).  The vocational expert also

stated that, in the relevant regional area (Tr. 309), the hypothetical person could

perform 3,000 to 3,500 unskilled, light jobs such as product checker, x-ray

inspector in the food industry, and take-down sorter; and 4,000 unskilled,

sedentary jobs such as press clipper, table worker, and jewelry polisher. (Tr. 310-11).

At the 2008 administrative hearing, Vanessa Harris, Ph.D., testified as a VE after reviewing the record and listening to Plaintiff's testimony. (Tr. 534-43). The ALJ again posed a series of hypothetical questions involving someone of Plaintiff's age, education, and past work experience, who could perform light work, alternating positions at will. (Tr. 534). The ALJ further restricted the individual from climbing ladders and scaffolds, and from balancing, crawling or kneeling, plus a limitation of only occasional pushing and pulling with the left lower extremity. (*Id*.). The ALJ also limited the individual to an indoor temperature-controlled, clean air environment, and no frequent bending. (Tr. 534). The VE testified that such an individual could perform light, unskilled jobs such as box-sealing inspector and garment sorter, representing approximately 4,500 jobs in the region. (Tr. 535). The VE further testified that such an individual could perform a minimum of 3,500 unskilled, sedentary jobs in the region. (*Id*.). The VE clarified that although the *Dictionary of Occupational Titles* does not address a limitation for alternating positions, she reached her determination based on her own experience and observations. (Tr. 565).

Turning to the remaining information in the administrative record, the most significant evidence for purposes of the present case consists of Plaintiff's

medical records and the opinions of several medical sources, summarized as follows.

Angela K. Ailes[-Frick], M.D.  Dr. Ailes was Plaintiff's primary care physician from May 2, 2002 (*see* Tr. 117) through May 2007.  (*See* Tr. 397).  (*See also* Doc. #7 at 7).  Treatment notes from Plaintiff's "new patient" first visit record her history of asthma and leg left amputation since childhood.  (Tr. 117).  The only mention at that time of back problems, however, is a reference to a "knot" on her "upper back," causing "no pain."  (Tr. 244).

A routine bone density test ordered by Plaintiff's gynecologist (*see* Tr. 110) revealed in October 2002 that Plaintiff had osteoporosis of the lumbar spine.  (Tr. 99).  On November 7, 2002, Plaintiff complained of low back pain radiating to and causing numbness in her thigh.  (Tr. 110).  The problem was described as "chronic, but intermittent," with "an acute exacerbation" of unknown origin.  (*Id.*).  Dr. Ailes ordered x-rays and a CT of Plaintiff's lumbar spine.  (Tr. 111).  The CT showed "moderate" stenosis and disc bulging at L2-3, L3-4 and L5-S1.  (Tr. 106-07).  On December 2, 2002, Plaintiff reported that the back pain "is a[ ]lot better," and that physical therapy "seems to be helping."  (Tr. 109).  She claimed to have had "one bad weekend since [her] last visit," after she "had walked a[ ]lot and moved furniture."  (Tr. 109).

A note in Plaintiff's records dated November 5, 2003, says that Plaintiff called to request a letter "stating diagnosis of slip [sic] disc and that Dr. Ailes [ ] treated her for asthma" and "for artificial leg." (Tr. 112). Dr. Ailes wrote such a note the same day, confirming that Plaintiff was her patient and was treated for back pain "from 10/02 to 12/02," as well as for asthma and the use of an artificial leg due to a left foot amputation at the age of seven. (Tr. 113, 243).

Dr. Ailes' treatment notes dated February 2, 2004, reflect that Plaintiff was "trying to get disability [because] of leg [and] back pain." (Tr. 241).

In June 2004, Plaintiff complained that her low back pain was worse and constant, causing problems with sitting, standing and walking. (Tr. 237). Dr. Ailes noted lower lumbar tenderness attributable to disc disease. (*Id.*). Plaintiff reported that she could not afford physical therapy, and that over-the-counter analgesics were "no help." (*Id.*). A note from Dr. Ailes dated June 23, 2004, states that Plaintiff

> has dis[c] herniation [at] L-4-L5, L5-S1[,] with canal stenosis. This condition causes chronic pain in back of [right] leg. Patient should not work in job with heavy lifting or repetitive bending.

(Tr. 238).

In August 2004, Plaintiff reported that the back pain still was "always there," but was "a little better," with no recent numbness. (Tr. 236). She said that

she had been doing back exercises and using ice and heat. (*Id.*). She also said that taking Naproxen was "not helping much," and that she was trying to get insurance in order to undergo physical therapy. (*Id.*). Dr. Ailes again noted lower lumbar tenderness. (*Id.*).

Back pain remained, but as a secondary complaint, during Plaintiff's September 1, 2004 visit. (Tr. 235). On September 27, 2004, Dr. Ailes wrote another note, indicating that Plaintiff had been "unemployed since 10-20-03 due to multiple medical problems/issues." (Tr. 230). Plaintiff continued to report back pain in November 2004, with pain medication still not helping and physical therapy still not available. (Tr. 227). Treatment notes from June 2005 indicate that Plaintiff continued to experience back pain and sciatic pain with no relief from over-the-counter drugs, and was "using [a] cane to walk." (Tr. 224). Back pain complaints and use of a cane continued on August 17, 2005. (Tr. 222).

The administrative record contains a narrative report signed by Dr. Ailes-Frick dated December 9, 2005. (Tr. 160). In that report, Dr. Ailes-Frick states that she treated Plaintiff for hypertension and asthma that "are currently under adequate control with medication," and for "significant back pain" that persisted "despite aggressive medical treatment." (*Id.*). She noted Plaintiff's 2002 diagnosis of disc herniation with stenosis, and that pain medications were

ineffective.  (*Id.*).  Because of Plaintiff's "difficulty with prolonged sitting, standing or walking," her inability "to do any significant amount of lifting or bending," and her need for "frequent position changes," Dr. Ailes-Frick opined that Plaintiff "is unable to work at and maintain gainful employment" on a full-time basis, "and I feel she would probably even have problems trying to maintain part time employment."  (*Id.*).

On March 15, 2006, Dr. Ailes-Frick's prepared a statement and a note indicating that Plaintiff became disabled on October 20, 2003 (Tr. 421), due to "lumbar dis[c] herniation with canal stenosis, low back pain, artificial leg."  (Tr. 420).  On September 7, 2006, Dr. Ailes-Frick noted tenderness in Plaintiff's lower lumbar area and again diagnosed chronic back pain and disc herniation.  (Tr. 411).  Notes from October 2006 indicate that pain medications were helping the back pain "a little."  (Tr. 410).

On a form for the state agency prepared on December 12, 2006, Dr. Ailes-Frick indicated that Plaintiff was unable to lift more than 10 pounds, to do frequent bending, to stand for more than 10 minutes, or to crawl or crouch.  (Tr. 409).  She also noted that Plaintiff "walks with cane."  (*Id.*).  Nevertheless, Dr. Ailes-Frick indicated that Plaintiff "<u>can</u> sit for long periods of time" (*id.*, emphasis

in original), and concluded that Plaintiff was "stable" and capable of working full-time, "no more than 40 hrs/wk," starting "at any time." (*Id.*).

A lumbar spine MRI ordered by Dr. Ailes-Frick and performed on December 20, 2006, showed severe facet arthropathy, diffuse disc bulging and moderate to severe canal stenosis at L4-5 and L5-S1, as well as two synovial cysts. (Tr. 373). An evaluation prepared that same month by a physical therapist to whom Dr. Ailes-Frick referred Plaintiff recommended a five-week course of therapy. (Tr. 454-62).

In January 2007, Plaintiff continued to report "constant" back and leg pain, although she indicated that physical therapy had "helped a little," and that the pain was "maybe a little better." (Tr. 407).

William D. Padamadan, M.D.  The Ohio Bureau of Disability Determination ["BDD"] referred Plaintiff to Dr. Padamadan for a consultative examination on January 15, 2004. (*See* Tr. 147-50). Dr. Padamadan diagnosed Plaintiff with obesity, a history of asthma "with no clinical findings," and "below knee amput[ation]." (Tr. 149). Based on his examination, Dr. Padamadan submitted a report concluding that Plaintiff "is able to sit, stand, and walk," and that "[h]er upper extremity functions for reaching, handling, fine and gross movements are in[]tact," although "[s]he is not a candidate for crawling and

kneeling" or "for balancing on beams and climbing poles and ladders," due to her prosthesis. (Tr. 150; *see also* Tr. 151-54 (Ohio BDD form completed by Dr. Padamadan)).

Plaintiff, however, sent a letter of complaint to the Social Security Administration about her visit to Dr. Padamadan, protesting that "I do not believe that the exam he gave me really had anything to do with why I applied for disability." (Tr. 74). Claiming that "he tryed [sic] to pull my slacks down and my blouse up," but "I stopped him" because "I just did not feel comfortable" (*id.*) as "there was not a nurse in there with us" (Tr. 75), Plaintiff further claimed that Dr. Padamadan "did not ask any questions about my back" and "did not look at my back." (Tr. 74). She argued that her disability decision should not be based on "the physical that this Doctor did on me." (Tr. 75).

Arthur L. Sagone, Jr., M.D. Dr. Sagone, a state agency reviewing physician, completed a physical residual functional capacity assessment on February 5, 2004. (Tr. 155-59). Dr. Sagone concluded that Plaintiff was capable of performing work at the light exertional level, with no foot controls on the left (Tr. 156); no climbing ladders, ropes or scaffolds; and only occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling. (Tr. 157).

Sarah B. Long, M.D.  Dr. Long, another state agency reviewing physician, affirmed Dr. Sagone's conclusions on April 19, 2004.  (Tr. 159).

Charles L. Walters, M.D.  Dr. Walters, a neurologist, performed a consultative examination of Plaintiff on December 17, 2005.  (Tr. 245).  He reported that Plaintiff was five feet and one inch tall, weighed 310 pounds, and walked "with a waddling gait using a cane."  (*Id.*).  Plaintiff complained of "severe low back pain that radiates into her hips and legs," and her CT scan confirmed anteriorlisthesis at L4-L5.  (*Id.*).  Dr. Walters also noted that Plaintiff had osteoporosis, was being treated for high blood pressure, complained of shortness of breath due to asthma, and had "several ulcers" on the stump of her amputated left leg.  (*Id.*).  He found no tenderness or muscle spasm in Plaintiff's lower back, although her lumbar spine's range of motion was limited.  (*Id.*).

Dr. Walters opined that Plaintiff "cannot stand and/or walk for more than three minutes at a time given her lower left leg amputation," and that her combination of impairments "would prevent her from performing substantial gainful work activity in a competitive work market, on a sustained basis."  (Tr. 246).  He concluded that she "has been disabled since October 20, 2002,[8] and her

---

[8]Plaintiff's Statement of Errors acknowledges that this date is incorrect and that her alleged onset date is October 20, 200**3**.  (Doc. #7 at 6, n.2).

disability can reasonably be expected to last for the rest of her life, even with optimal treatment and therapy." (*Id.*).

Joseph M. Metz, M.D. Dr. Metz assumed the role of Plaintiff's primary care physician on October 8, 2007, when she was seen for chronic low back pain radiating to the thigh. (Tr. 394). At that time, he diagnosed Plaintiff as "morbidly obese," with bilateral tenderness along the lumbar spine, but "no apparent distress." (Tr. 395). He prescribed a refill of Darvocet for "severe pain" (Tr. 396), and recommended back strengthening exercises and weight loss. (Tr. 395). Following another office visit two weeks later (*see* Tr. 387-88), Dr. Metz wrote Plaintiff a prescription for a shower chair (Tr. 393), and referred her for a prosthesis adjustment. (Tr. 392). He also referred her to a chiropractor. (Tr. 388).

Following an office visit on January 29, 2008 (Tr. 513-14), Dr. Metz completed medical forms indicating that Plaintiff "can't sit, stand, bend [or] walk for any length of time," due to asthma, left foot amputation and chronic back pain caused by a herniated lumbar disc. (Tr. 381). He opined that Plaintiff was unemployable for 12 months or more as a result of her impairments. (Tr. 382). He also ordered a new lumbar spine MRI. (Tr. 515). On February 7, 2008, that MRI revealed "no appreciable interval change in the appearance of the lumbar spine" since December 2006. (Tr. 438-39, 516-17).

On June 18, 2008, Dr. Metz completed a health summary and other forms relative to Plaintiff. (Tr. 509-512). He indicated that Plaintiff could stand or walk for only 30 minutes on a sustained basis, could alternately sit or stand every 30 minutes to two hours, could sit for six and one half to eight hours, and could not repetitively operate foot controls. (Tr. 509). He also opined that Plaintiff could never bend, squat, crawl or climb (id.), and that she lacked the residual functional capacity to do even sedentary work on a sustained basis. (Tr. 510). Dr. Metz noted explicitly that he had completed the form "as it pertains to the patient with a lower extremity prosthesis," and that "[a]ny other limitations w[ould] have to be evaluated in a functional capacity exam." (Id.).

Chiropractic Treatments.[9] Plaintiff completed a series of 12 chiropractic treatments from October 31, 2007 through November 23, 2007. (See Tr. 465-94). On January 18, 2008, Plaintiff "was evaluated . . . for progress and response to the care plan." (Tr. 508). Plaintiff reported her pain as a "6" on a scale of zero to 10, and that her lower back was "worse since the last visit." (Id.). Although the report assessed "no change" in the spine on that date, it also reported tenderness on palpation, decreased range of motion, and increased muscle tone. (Id.). Plaintiff's treatment plan was "modified to consist of Spinal Manipulation" and

---

[9]Excepted where credited to a specific individual herein, these records as they appear in the administrative record are not attributed to any particular practitioner.

traction three times a week for four weeks.   On June 18, 2008, G.T. Daubenspeck, D.C. , prepared a detailed report indicating that Plaintiff's overall pain level was at "8" on a zero to 10 scale, with "a definite 10 with sharp pains and tingling" in her right leg.  (Tr. 497).  Diagnoses included displacement of lumbar intervertebral disc without myelopathy, along with sublaxation, neuritis or radiculitis.  (Tr. 499).

Stephen W. Duritsch, M.D.  At the request of the Ohio BDD, Dr. Duritsch evaluated Plaintiff as an independent practitioner of rehabilitative medicine.  (Tr. 440-51).  In addition to performing a physical examination on May 7, 2008, Dr. Duritsch also reviewed the February 2008 MRI and Dr. Padamadan's January 2004 report.  (Tr. 440).  He assessed Plaintiff with left below-the knee amputation at age seven; severe lumbar spinal stenosis at L4-L5 and L5-S1, with anterolisthesis at L4-L5; bilateral carpal tunnel syndrome; abnormal gait "with the need to use a cane for ambulation outside the home;" and obesity.  (Tr. 441). He noted that Plaintiff "could not perform repetitive activities with the bilateral upper limbs" and "should not be exposed to vibration" due to carpal tunnel syndrome.  (*Id.*).  He also opined that Plaintiff "can sit, but has limitation in standing and walking due to her spine condition."  (*Id.*).

With those limitations in mind, Dr. Duritsch concluded that Plaintiff occasionally could lift or carry up to 10 pounds, but no more (Tr. 446); could sit for one hour at a time, up to five or six hours total per day, and could stand or walk for 10 to 15 minutes at a time, for up to one total hour of each per day (Tr. 447); could never operate controls with her left foot (Tr. 448); and could never climb stairs, ramps, ladders or scaffolds, or kneel or crawl, but occasionally could balance, stoop or crouch.  (Tr. 449).  He also indicated that Plaintiff could not ambulate without using two canes.  (Tr. 451).

## III.    THE "DISABILITY" REQUIREMENT & ADMINISTRATIVE REVIEW

### A.    Applicable Standards

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope.  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies.[10]  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

---

[10]Impairments also must be expected either to cause death or last 12 or longer.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. (*See* Tr. 14-15); *see also* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

## B.    The ALJ's Decision

At Step 1 of the sequential evaluation in his second decision, the ALJ found that Plaintiff met the insured-status requirement for DIB eligibility through December 31, 2008.  (Tr. 321).  The ALJ also found at Step 1 that after her alleged disability onset date, Plaintiff had engaged in substantial gainful activity through May 2005, by operating a newspaper delivery business.  (*Id.*).

The ALJ found at Step 2 that Plaintiff has the severe impairments of remote history of amputation below the knee on the left with use of a prosthesis; vertebrogenic disorder of the lumbar spine; obesity; asthma and allergies; and osteoporosis.  (*Id.*).  The ALJ determined at Step 3 that Plaintiff does not have an impairment or combination of impairments that meets or equals the level of severity described in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 322).

At Step 4 the ALJ found Plaintiff capable of performing the exertional requirements of a reduced range of light work, subject to limitations of lifting up to 20 pounds occasionally and 10 pounds frequently; must have the option to alternate positions at will; must avoid climbing ladders or scaffolds or working at heights, and balancing, crawling or kneeling; no more than occasional pushing/pulling with the left leg; must avoid frequent bending; and limited to inside work in a temperature-controlled environment.  (Tr. 323).  The ALJ further

found that Plaintiff is unable to perform her past relevant work, but is able to perform other jobs that exist in significant numbers in the national economy. (Tr. 327). This assessment, along with the ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that Plaintiff was not under a disability and hence not eligible for DIB and SSI. (Tr. 328-29).

## IV.    JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: whether substantial evidence in the administrative record supports the ALJ's factual findings and whether the ALJ "applied the correct legal criteria." *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F.3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance . . .'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review of the administrative record and the ALJ's decision is not *de novo*. *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). The required analysis is not driven by whether the Court agrees or disagrees with an ALJ's factual findings or by whether the administrative record contains

evidence contrary to those findings. *Rogers*, 486 F.3d at 241; *see Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her*, 203 F.3d at 389-90).

The second line of judicial inquiry – reviewing the ALJ's legal criteria – may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *See Bowen*, 478 F.3d at 746. This occurs, for example, when the ALJ has failed to follow the Commissioner's "own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen*, 478 F.3d at 746 (citing in part *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.2004)).

## V. DISCUSSION

### A. The Parties' Contentions

Although presented as two "substantial evidence" issues in her Statement of Errors (*see* Doc. #7 at 1), the essence of Plaintiff's contention is that the ALJ did not properly consider the medical evidence of record in rendering his most recent decision. Specifically, she complains that the ALJ continued to rely on an earlier consulting physician opinion of Dr. Padamadan, to which she had objected, despite the availability of a newer consulting physician assessment that was

amply supported and consistent with other record evidence. She also urges that the ALJ did not properly consider the opinions of her two treating physicians who indicated that she could not perform full-time work on a sustained basis.

Conversely, the Commissioner argues that the ALJ appropriately weighed the evidence, and that his conclusions are supported by substantial evidence. (Doc. #12).

### B.    Medical Source Opinions

#### 1.    *Treating Medical Sources*

Key among the standards to which an ALJ must adhere is the principle that greater deference generally is given to the opinions of treating medical sources than to the opinions of a non-treating medical source. *Rogers*, 486 F.3d at 242; *see* 20 C.F.R. § 404.1527(d)(2). This is so, the Regulations explain, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examiners, such as consultative examinations or brief hospitalizations . . ." 20 C.F.R. § 404.1527(d)(2); *see also Rogers*, 486 F.3d at 242. In light of this, an ALJ must apply controlling weight to a treating source's opinion when it is both well supported

by medically acceptable data and not inconsistent with other substantial evidence of record. *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at 544, 20 C.F.R. § 404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544, but the ALJ's analysis does not end there. Instead, the Regulations create a further mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable [data] . . . or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected . . .

Social Security Ruling 96-2p, 1996 WL 374188 at *4. The Regulations require the ALJ to continue the evaluation of the treating source's opinions by considering "a host of other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

2. *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180, at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in 20 C.F.R. § 404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p at *2-*3.

**C. Analysis**

Leading into his assessment of Plaintiff's residual functional capacity, ALJ Padilla stated that he had "considered opinion evidence in accordance with the requirements of 20 CFR [§§] 404.1527 and 416.927 and [Social Security Rulings] 96-2p, 96-5p and 96-6p." The Court nonetheless must scrutinize the ALJ's

decision to determine whether he in fact applied the correct legal criteria when evaluating the medical source opinions. *See Bowen*, 478 F.3d at 746.

The Court turns first to the ALJ's discussion of the opinion of Dr. Duritsch, the more recent consulting examiner on whose opinion Plaintiff urges the ALJ should have relied, instead of on that of Dr. Padamadan. (*See* Doc. #7 at 1, 13-17). Focusing on Dr. Duritsch's conclusion that Plaintiff "could not perform repetitive activities with the bilateral upper limbs" because of "weakness in the hands" due to carpal tunnel syndrome attributable to her "cane use . . . over the years" (Tr. 324, quoting Tr. 441), the ALJ detailed why Dr. Duritsch's opinion to that effect appeared to be neither consistent with the other medical evidence of record nor supported by his own objective findings. While acknowledging Plaintiff's "remote history of carpal tunnel syndrome" dating back to 1986 (Tr. 324), ALJ Padilla correctly observed that "[t]here is no evidence of any mention of problems with her hands to family doctors or other treating sources" since the 2006 decision. (*Id.*). Moreover, he noted that Dr. Duritsch's own objective testing reflected "full five strength in both arms and hands" and "no abnormalities with the use of the hands" for such functions as picking up large and small objects, writing, opening jars, buttoning or unbuttoning. (*Id.*; *see* Tr. 442).

In addition, the ALJ remarked on the lack of evidence to support Dr. Duritsch's apparent assumptions that "long term use of a cane(s)" caused Plaintiff to have bilateral carpal tunnel syndrome, and that Plaintiff's use of two canes was medically necessary.  (Tr. 324).  He noted that, according to her own testimony, Plaintiff "does not have a long history of using two canes," and also pointed out "the lack of weighty specialist evaluations, treatment, or opinions" (by an orthopedist, neurologist or surgeon) substantiating Plaintiff's "need for ambulatory aid."  (*Id.*).  Instead, the ALJ suggested, Dr. Duritsch "may have [been] overly influenced" by Plaintiff's allegations to him, making his assessment "somewhat unreliable."  (*Id.*).  Having thus determined Dr. Duritsch's objectivity to be suspect, ALJ Padilla emphasized that while he had "not ignored" Dr. Duritsch's opinion (Tr. 324-35), he did not give it "substantial weight" (Tr. 324), finding that it "lacked [a] substantial, objective basis to support sedentary work." (Tr. 325).

In so doing, the ALJ complied with the applicable requirements for evaluating the opinions of non-treating physicians.  *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p at *2-*3.  He addressed the factors of supportability, consistency and specialization set forth in 20 C.F.R. § 404.1527(d), and concluded that the opinion of Dr. Duritsch, a "physical medicine and rehabilitation physician" (Tr.

323) rather than an orthopedic or neurological specialist, was not supported by his own clinical findings or substantiated by the records of Plaintiff's treating physicians, and also was inconsistent with other record medical evidence indicating a lesser degree of impairment. Substantial evidence supports each of those conclusions. Additionally, aside from those portions of Dr. Duritsch's opinion that the ALJ found to be unsubstantiated and thus not credible (*i.e.*, the carpal tunnel syndrome and need for two canes findings), the ALJ's residual functional capacity assessment is largely consistent with Dr. Duritsch's conclusions.

Moreover, the record does not bear out Plaintiff's suggestion that ALJ Padilla improperly "continued to rely" on the "cursory exam" underlying the criticized earlier opinion of Dr. Padamadan. (*See* Doc. 7 at 1, 15). Although the ALJ <u>did</u> offer some defense to Plaintiff's criticisms of Dr. Padamadan – "not[ing] for the record that Dr. Padamadan has been doing examinations for the BDD for many years and inappropriate behavior has not been a problem" (Tr. 323) – that lone comment does not amount to "reliance" on Dr. Padamadan's previous opinion. The only other mention of Dr. Padamadan in the ALJ's residual functional capacity analysis was his observation that "[n]either Dr. Padamadan . . . nor Dr. Walters . . . reported any objective evidence of carpal tunnel conditions."

(Tr. 324). Because that observation merely reinforced the complete lack of support for Dr. Duritsch's carpal tunnel findings, without depending upon any questionable finding of Dr. Padamadan to underpin the ALJ's conclusions, the ALJ cannot be said to have improperly "relied" on the opinion of Dr. Padamadan that Plaintiff sought to discredit. The ALJ thus did not err in his handling of the opinions of the two non-treating physicians consulted on behalf of the Ohio BDD.

ALJ Padilla also "applied the correct legal criteria" in evaluating the opinions of Plaintiff's two treating physicians, Drs. Ailes[-Frick] and Metz. *See Bowen*, 478 F.3d at 745-46. The ALJ accurately observed that Dr. Metz was Plaintiff's relatively new "family doctor" whose finding that Plaintiff could not perform even sedentary work was based explicitly and "solely on [Plaintiff's] use of a prosthesis," despite the fact that Plaintiff had relied on such a device since the age of seven and throughout her years of gainful employment. (Tr. 325; *see* 510). Moreover, Dr. Metz pointedly had declined to render a disability opinion based on "[a]ny other limitations" (Tr. 510), including Plaintiff's back problems and related pain. (*See* Tr. 325). The ALJ's decision to not give that assessment "[s]ubstantial weight" (*id.*) appropriately was based on consideration of such factors as the length and extent of Dr. Metz's treatment relationship with Plaintiff; his specialization in family medicine rather than as a "back specialist[ ],

orthopedic, neurologic, or surgical specialist[ ];" the lack of support for his conclusion about the limitations imposed by Plaintiff's prosthesis; and the inconsistency of that conclusion with other record evidence. (*See* Tr. 326, where the ALJ specifically enumerated and applied these factors). *See Rogers*, 486 F.3d at 242; *Wilson*, 378 F.2d at 544. The ALJ also appropriately "rejected" Dr. Metz's January 2008 opinion that Plaintiff was "unemployable" for at least 12 months, because Dr. Metz again failed to "provide detailed findings or substantial medical support for this assessment." (Tr. 325; *see* Tr. 381-82). Because substantial evidence supports them, this Court is not free to disrupt the ALJ's conclusions.

Finally, the ALJ also did not err in his assessment of Dr. Ailes[-Frick]'s opinions regarding Plaintiff's physical limitations. As the ALJ himself noted, on Plaintiff's first appeal to this Court from the ALJ's August 2006 non-disability decision, this Court "did not find any basis to remand based on [ALJ Padilla's] rejection of [Dr. Ailes'] treating source opinion." (Tr. 325). Dr. Ailes-Frick ceased treating Plaintiff in 2007 (*see* Tr. 407), when Dr. Metz assumed her care. (Tr. 394). Nothing cited by Plaintiff from among Dr. Ailes-Frick's findings after the 2006 decision (*see* Doc. #7 at 19) would dictate a different result than that reached by the ALJ in 2006 with regard to her opinions.

Moreover, contrary to the 2005 report in which Dr. Ailes-Frick opined that Plaintiff "is unable to work at and maintain gainful employment" on a full-time basis and "would probably even have problems trying to maintain part time employment" (Tr. 160), and her March 2006 note indicating that Plaintiff became disabled on October 20, 2003 (Tr. 421), Dr. Ailes-Frick opined on December 12, 2006, that Plaintiff "<u>can</u> sit for long periods of time" (Tr. 409, emphasis in original), and was capable of working full-time, starting "at any time." (*Id.*). Consequently, Dr. Ailes-Frick's earlier opinions that Plaintiff was disabled not only were inconsistent with other medical opinions of record, but indeed were inconsistent with her <u>own</u> later opinion. As such, the ALJ did not err in declining to give controlling weight to Dr. Ailes-Frick's treating physician opinion. *See* 20 C.F.R. § 404.1527(d)(2); *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544.

**IT THEREFORE IS RECOMMENDED THAT**:

1. The Commissioner's final non-disability finding be AFFIRMED; and

2. This case be TERMINATED on the docket of this Court.


April 23, 2010                                              s/Sharon L. Ovington   
                                                                    Sharon L. Ovington
                                                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).